Filed 10/22/20  P. v. Witherspoon CA2/7

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RODERICK WITHERSPOON,<br><br>    Defendant and Appellant. | B303406<br><br>(Los Angeles County<br>Super. Ct. No. BA008291) |

APPEAL from an order of the Superior Court of Los Angeles County, David Herriford, Judge.  Affirmed.

Mark D. Lenenberg, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, and Idan Ivri and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

Roderick Witherspoon appeals from the superior court's order denying his petition under Penal Code section 1170.95,[1] which allows certain defendants convicted of murder under a felony murder or natural and probable consequences theory to petition the court to vacate their convictions and for resentencing. In 1991 a jury found Witherspoon guilty of first degree murder for the robbery and murder of Vincent Rucker, and the trial court sentenced Witherspoon to a prison term of 25 years to life.  The verdict form did not indicate whether the jury convicted Witherspoon of deliberate, premeditated murder or of robbery felony murder.

After Witherspoon filed a petition under section 1170.95, the superior court appointed counsel for Witherspoon and held an evidentiary hearing on the petition, even though the court never issued an order to show cause under section 1170.95, subdivision (c).  The court denied the petition, ruling Witherspoon "could still be convicted" of first degree felony murder under section 189, subdivision (e)(3).  The court concluded Witherspoon was a major participant in the underlying felony who acted with reckless indifference to human life, as defined by *People v. Clark* (2016) 63 Cal.4th 522 (*Clark*) and *People v. Banks* (2015) 61 Cal.4th 788 (*Banks*).

Witherspoon contends the court erred by applying the wrong burden of proof and relying on inadmissible hearsay.  He also argues there was insufficient evidence he acted with reckless

---

[1]    Undesignated statutory references are to the Penal Code.

indifference to human life.  Because none of Witherspoon's arguments has merit, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. *A Jury Convicts Witherspoon of Murder*

#### 1. *Someone Shoots Rucker for Drug Money*

On August 28, 1989 Vincent Rucker flew to Los Angeles from Michigan with several hundred thousand dollars at his disposal to buy cocaine for resale back in Michigan.  A friend of Rucker's father introduced Rucker by phone to Witherspoon, who told Rucker and his father he had 15 kilograms of cocaine and could get five more.  Witherspoon told Rucker's father he would "take care" of Rucker, and Witherspoon met with Rucker several times over the next week.  On September 5, 1989 Rucker told his father that he planned to meet Witherspoon the next day and that he hoped to return to Michigan that night.

On the afternoon of September 6, 1989 Rucker visited his sister, who lived in Los Angeles with her husband, Joel Muwwakkil.  Witherspoon and a friend of Rucker's from Michigan named Bill were also there.  Muwwakkil saw a gray Ford with a Michigan license plate in his driveway.  He went outside and saw Bill and two other men next to the car.  Muwwakkil could see a pillowcase and "neat stacks of money" covering the backseat of the Ford.  Muwwakkil watched as Witherspoon backed his red Nissan Maxima into the driveway and Rucker carried a nearly full pillowcase from the Ford to the Nissan and placed it on the backseat.  Rucker told his sister that he "had to make a run" and that, when he returned, he wanted her to drive him to the airport.  Rucker left with Witherspoon in

the Nissan, but instead of returning to his sister's house later that night, he stayed with Witherspoon at the home of Witherspoon's girlfriend.

The next afternoon Rucker went alone to a "bikini bar" near his motel. Rucker called Muwwakkil from the bar and asked to meet him and Bill at Muwwakkil's house at 9:30 p.m. that night. Rucker told Muwwakkil he was ready to go home to Michigan. Rucker left the bar alone. At 8:23 p.m. Witherspoon called Rucker's motel.

At 8:35 p.m. Witherspoon went to the home of Amisa Durham and her sister. Witherspoon showed Durham "expensive" new clothes and shoes he bought that day. He asked Durham if she would help him count some money, and she initially agreed. Witherspoon took a luxury brand duffel bag with the handles still wrapped in packaging and brought it inside the house. Under the "bundles of money" in the bag was a black vinyl briefcase containing a semi-automatic rifle that Witherspoon told Durham he needed for protection on the street. Witherspoon said he had another smaller gun under the seat of his car. Durham, who worked in the Los Angeles Police Department property room, told Witherspoon she could not help him count the money. Witherspoon left Durham's house between 8:50 p.m. and 9:05 p.m.

At 9:25 p.m. Vincent Cash heard a single gunshot and then a burst of gunshots. Cash lived near a freeway three and a half miles from Durham's house and in a neighborhood where Witherspoon used to live and still owned a house. Cash was watching television at the time and talking on the phone when he heard the shots, and he did not hear a car stopping, a car door slamming, or voices. Cash stayed on the floor for a few minutes,

4

got up, looked out his window, and saw a body in the street. He called the 911 emergency operator at 9:27 p.m. Paramedics arrived to find Rucker still alive, but he soon bled to death from nine gunshot wounds. Meanwhile, also at 9:25 p.m. Rucker's friend Bill called Muwwakkil asking about Rucker, and at 9:30 p.m. Bill arrived at Muwwakkil's house.

The next day Rucker's sister learned of Rucker's death and called their father, George Harris. Harris called Witherspoon, who told Harris that Rucker borrowed Witherspoon's car to drive home a dancer named Taboo from the bikini bar. Witherspoon said that Taboo's ex-boyfriend must have been home when she arrived and that he must have shot Rucker and driven away in Witherspoon's car. Witherspoon told Harris that his car had very little gas and that "'whoever did Vince'" must have run out of gas and abandoned the car just off the freeway near the location where Rucker was shot. Witherspoon told Harris the police found the car and impounded it, but that 12 kilograms of cocaine and $30,000 "left over" from the drug deal were still in the trunk. Witherspoon told Harris he would recover his car and send Harris the cocaine and the cash still inside. The next day Witherspoon again spoke to Harris, but claimed Taboo's "cousin" killed Rucker.

### 2. *The Police Investigate*

A police investigation determined the weapon used to kill Rucker was a Smith & Wesson 9-millimeter automatic pistol. Investigators found 13 casings near Rucker's body, and they concluded several shots struck the road and ricocheted. Rucker's wallet was left undisturbed in his pocket, along with a piece of paper with the name "Rod" and Witherspoon's phone number.

Autopsy findings showed that Rucker was shot once in the back and several more times while he was on the ground.

Police questioned Witherspoon on September 11, 1989, four days after the shooting. Witherspoon told police he went to a bikini bar with Rucker the evening of the murder. He said that at approximately 8:00 p.m. Rucker "had a hassle" with Taboo's boyfriend and that Rucker borrowed Witherspoon's car to drive Taboo home. An hour later Taboo paged Witherspoon and told him her boyfriend shot Rucker.[2] Police investigators located Taboo, but she had not worked at the bikini bar for several months, and on the day of the shooting she was at home recovering from a nervous breakdown. Taboo told police she did not know and had never heard of Rucker or Witherspoon.

Police obtained a search warrant for Witherspoon's car, which had not been impounded. Witherspoon's wife led police to the car, which was parked several miles from Witherspoon's residence. The car was marred by scrapes and dents, the trunk was wired shut, and there was evidence of a bullet ricochet on one side. The police did not find any cocaine, cash, guns, bullets, or blood in the car, but they did recover an empty luxury brand duffel bag from Witherspoon's closet.

Police arrested Witherspoon for Rucker's murder on September 14, 1989. From jail Witherspoon made several phone calls. He called Harris and told him Taboo had been killed and

---

[2]     "For those born after the year 2000, a pager is 'a small radio receiver that beeps, vibrates, or flashes to alert the user to an incoming message[,] which is usually displayed on a small screen,' widely used in the era preceding cell phones." (*Brackin v. Medtronic, Inc.* (W.D. Tenn., Sept. 14, 2017, No. 17-CV-2101-SHL-CGC) 2017 WL 5957204, at p. 1, fn. 3.)

the police arrested him for her murder. He also told Harris that he recovered his impounded car and that he would send Harris what Rucker "had coming." Witherspoon also called a neighbor and asked him to tell police he drove Witherspoon's car home on the evening of the murder, but Witherspoon's neighbor said he would not lie to police. Finally, Witherspoon called Durham and asked her to tell her sister to tell police that, on a date Witherspoon specified but Durham could not remember, Durham's sister picked up Witherspoon in West Covina at 9:00 p.m. in her car.

### 3. *A Jury Convicts Witherspoon, and This Court Affirms the Judgment*

The People charged Witherspoon with first degree murder (§ 187) and robbery (§ 211) and alleged a robbery special circumstance under section 190.2, subdivision (a)(17). In a pretrial hearing the trial court granted Witherspoon's motion under section 995 to dismiss the robbery charge and the robbery murder special circumstance allegation because there was insufficient evidence independent of Witherspoon's extrajudicial statements to establish the corpus delicti for the crime of robbery.

Before the close of the People's case in chief, counsel met in chambers to discuss jury instructions. The trial court told the parties it would instruct the jury on first degree premeditated murder, robbery felony murder, and robbery. The court declined to instruct the jury on second degree murder, stating that the murder was "either premeditated or it's a robbery." Over counsel for Witherspoon's objection, the court also agreed to instruct the jury on aiding and abetting because "there is a possibility that this was a set-up."

The jury found Witherspoon guilty of first degree murder without specifying whether Witherspoon committed premeditated murder or felony murder. The verdict form mistakenly included the robbery murder special circumstance allegation the court had dismissed, and the jury found the allegation true. The court, however, never instructed the jury on that allegation and instead gave only the instruction for felony murder occurring during the commission or attempted commission of robbery. In the People's opposition to Witherspoon's motion for new trial, the People acknowledged the special circumstance allegation under section 190.2 was "mistakenly" included in the verdict form.[3] In May 1991 the court sentenced Witherspoon to a prison term of 25 years to life.

In 1994 this court affirmed the judgment. (*People v. Witherspoon* (Mar. 14, 1994, B061260) [nonpub. opn.] (*Witherspoon I*).) Witherspoon argued, among other things, that there was insufficient evidence of premeditated or felony murder and that the trial court erred in instructing the jury on an aiding and abetting theory. This court held there was substantial evidence Witherspoon murdered Rucker deliberately and with

---

[3] The People argue Witherspoon is ineligible for relief under section 1170.95 because the jury found true the special circumstance allegation under section 190.2, subdivision (a)(17). As discussed, the verdict form included a special circumstance allegation under section 190.2, but the trial court never instructed the jury on that allegation because it was dismissed before trial. Thus, the jury's true finding on that allegation has no effect on Witherspoon's eligibility for relief under section 1170.95.

8

premeditation and during the commission of a robbery.[4]  With regard to the aiding and abetting instruction, this court stated that, because the "evidentiary gap" left by the lack of any witness to the murder "allowed the possibility more than one person was present and participated in [Rucker's] murder," the trial court properly instructed the jury on aiding and abetting.

B.      *The Legislature Enacts Senate Bill No. 1437 and Establishes the Section 1170.95 Petition Procedure*

Senate Bill No. 1437 (Stats. 2018, ch. 1015, § 4), effective January 1, 2019, amended the felony murder rule and eliminated the natural and probable consequences doctrine as it relates to murder by amending sections 188 and 189.  New section 188, subdivision (a)(3), provides, "Except as stated in subdivision (e) of Section 189, in order to be convicted of murder, a principal in a crime shall act with malice aforethought.  Malice shall not be imputed to a person based solely on his or her participation in a crime."  New section 189, subdivision (e), provides that, with respect to a participant in the perpetration or attempted perpetration of a felony listed in section 189, subdivision (a), in which a death occurs (that is, those crimes that provide the basis for first degree felony murder), an individual is liable for murder

---

[4]      The People argue Witherspoon is ineligible for relief under section 1170.95 because this court previously held the evidence at trial was sufficient to prove express malice.  As discussed, however, the verdict does not indicate whether the jury convicted Witherspoon of premeditated or felony murder, and a holding in the alternative that substantial evidence supported either theory on direct appeal is not equivalent to a finding beyond a reasonable doubt, as required by section 1170.95, subdivision (d)(3).

9

"only if one of the following is proven: [¶] (1) The person was the actual killer. [¶] (2) The person was not the actual killer, but, with the intent to kill, aided, abetted, counseled, commanded, induced, solicited, requested, or assisted the actual killer in the commission of murder in the first degree. [¶] (3) The person was a major participant in the underlying felony and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." (See *People v. Galvan* (2020) 52 Cal.App.5th 1134, 1140 [Senate Bill No. 1437 "eliminated the natural and probable consequences doctrine as a basis for murder liability, and added a requirement for felony murder that a defendant must have been at least a major participant in the underlying felony and have acted with reckless indifference to human life"], review granted Oct. 14, 2020, S264284.)

Senate Bill No. 1437, through new section 1170.95, also authorizes an individual convicted of felony murder or murder under a natural and probable consequences theory to petition the sentencing court to vacate the conviction and to be resentenced on any remaining counts if the individual could not have been convicted of murder under Senate Bill No. 1437's changes to the definition of the crime. The petition must include a declaration by the petitioner he or she is eligible for relief under this section, the superior court case number and year of the petitioner's conviction, and a statement whether the petitioner requests the appointment of counsel. (§ 1170.95, subd. (b)(1); see *People v. Verdugo* (2020) 44 Cal.App.5th 320, 326-327, review granted Mar. 18, 2020, S260493 (*Verdugo*).)[5]

---

[5] The Supreme Court deferred briefing in *Verdugo*, *supra*, S260493 pending its decision in *People v. Lewis* (2020) 43 Cal.App.5th 1128, review granted March 18, 2020, S260598.

If the petition contains all required information, and the court determines the petition is facially sufficient, section 1170.95, subdivision (c), prescribes a two-step procedure for the court to determine whether to issue an order to show cause: "'The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response . . . and the petitioner may file and serve a reply . . . . If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause.'" (*Verdugo*, *supra*, 44 Cal.App.5th at p. 327.) Thus, section 1170.95, subdivision (c), "prescribes two additional court reviews before an order to show cause may issue, one made before any briefing to determine whether the petitioner has made a prima facie showing he or she falls within section 1170.95—that is, that the petitioner may be eligible for relief—and a second after briefing by both sides to determine whether the petitioner has made a prima facie showing he or she is entitled to relief." (*Verdugo*, at pp. 327-328.)

If the court determines the petitioner has made a prima facie showing and the court issues an order to show cause, the court must hold a hearing to determine whether to vacate the murder conviction and to recall the sentence and resentence the

The Supreme Court limited briefing and argument in *Lewis* to the following issues: (1) May superior courts consider the record of conviction in determining whether a defendant has made a prima facie showing of eligibility for relief under Penal Code section 1170.95? (2) When does the right to appointed counsel arise under Penal Code section 1170.95, subdivision (c)?

11

petitioner on any remaining counts.  (§ 1170.95, subd. (d)(1); see *Verdugo*, *supra*, 44 Cal.App.5th at p. 327.)  At the hearing the prosecution has the burden of proving beyond a reasonable doubt the petitioner is ineligible for resentencing.  (§ 1170.95, subd. (d)(3).)  The prosecutor and petitioner may rely on the record of conviction or offer new or additional evidence.  (See *People v. Tarkington* (2020) 49 Cal.App.5th 892, 898-899, review granted Aug. 12, 2020, S263219; *People v. Edwards* (2020) 48 Cal.App.5th 666, 674, review granted July 8, 2020, S262481; *People v. Lewis* (2020) 43 Cal.App.5th 1128, 1136, review granted Mar. 18, 2020, S260598.)

      C.     *Witherspoon Files a Petition Under Section 1170.95*

On February 27, 2019 Witherspoon filed a petition under section 1170.95, using "a downloadable form petition/declaration prepared by Re:Store Justice, a cosponsor of the legislation (see Sen. Com. on Public Safety, Rep. on Sen. Bill No. 1437 (2017-2018 Reg. Sess.) as amended Feb. 16, 2018, p. 1)." (*Verdugo*, *supra*, 44 Cal.App.5th at p. 324.)  The form petition "consists of a declaration with boxes to be checked against averments essentially tracking the statutory language as to the prerequisites for filing a petition and demonstrating a prima facie showing that the petitioner falls within the provisions of section 1170.95 and is eligible for relief."  (*People v. Edwards*, *supra*, 48 Cal.App.5th at p. 670.)

Witherspoon checked almost every box on the form petition. Specifically, he checked boxes alleging (1) "A complaint, information, or indictment was filed against me that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine"; (2a) "At

12

trial, I was convicted of 1st or 2nd degree murder pursuant to the felony murder rule or the natural and probable consequences doctrine"; (3) "I could not now be convicted of 1st or 2nd degree murder because of changes made to Penal Code § § 188 and 189, effective January 1, 2019"; (4) "I request that this court appoint counsel for me during this re-sentencing process"; and (5) "I was convicted of 1st degree felony murder and I could not now be convicted because of changes to Penal Code § 189, effective January 1, 2019 . . . ." In connection with this last checked box, Witherspoon checked sub-boxes alleging "I was not the actual killer"; "I did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in the commission of murder in the first degree"; "I was not a major participant in the felony or I did not act with reckless indifference to human life during the course of the crime or felony"; and "The victim of the murder was not a peace officer . . . ." Finally, Witherspoon checked the box alleging "There has been a prior determination by a court or jury that I was not a major participant and/or did not act with reckless indifference to human life under Penal Code § 190.2(d). Therefore, I am entitled to be re-sentenced pursuant to § 1170.95(d)(2)."

The superior court appointed counsel for Witherspoon, and the prosecutor filed an informal opposition to Witherspoon's petition. The prosecutor argued Witherspoon was ineligible for relief under section 1170.95 because the evidence at trial showed Witherspoon was the actual killer or a major participant who acted with reckless indifference to human life. On May 13, 2019 the prosecutor filed an addendum to the informal reply attaching this court's 1994 opinion. On June 25, 2019 Witherspoon filed a reply asserting he neither robbed nor killed Rucker, and the

13

prosecutor filed another addendum with the reporter's transcript and clerk's transcript from Witherspoon's 1991 trial.

The superior court never found Witherspoon made a prima facie showing he fell within the provisions of section 1170.95, nor did the court issue an order to show cause. The court nevertheless set an evidentiary hearing and held it on December 13, 2019, after which the court denied the petition. The court ruled Witherspoon was not entitled to relief under section 1170.95 because Witherspoon "could still be convicted" for first degree murder under amended sections 188 and 189 because he was a major participant in the robbery and acted with reckless indifference to human life. The superior court also stated Witherspoon "likely pulled the trigger himself," but the court stopped short of making a factual finding Witherspoon was the "actual killer" under section 189, subdivision (e)(1). Witherspoon timely appealed.

## DISCUSSION

A. *Standard of Review*

We agree with the parties the superior court's ruling was a decision on the merits of Witherspoon's petition following an evidentiary hearing under section 1170.95, subdivision (d). While the superior court did not issue an order to show cause under section 1170.95, subdivision (c), it appears the court intended the December 13, 2019 hearing to be an evidentiary hearing under section 1170.95, subdivision (d). In particular, the superior court invited the parties to submit new or additional evidence outside the record of conviction, as contemplated by section 1170.95, subdivision (d)(3).

14

The parties also acknowledge there is no published decision establishing the standard of review for a superior court order denying a petition under section 1170.95 following an evidentiary hearing. The standard of review for decisions determining a petitioner's eligibility for resentencing under Proposition 47, the Safe Neighborhoods and School Act of 2014 (§ 1170.18), however, is instructive. Like courts ruling on petitions under section 1170.95, courts considering whether to resentence petitioners under Proposition 47 may consider evidence outside the record of conviction and, if necessary, make factual findings. (See *People v. Sledge* (2017) 7 Cal.App.5th 1089, 1095 ["'[a]n evidentiary hearing is required if . . . there is a reasonable likelihood that the petitioner may be entitled to relief and the petitioner's entitlement to relief depends on the resolution of an issue of fact'"].) Although section 1170.95 creates a mechanism arguably broader than the "sentencing proceeding" prescribed by Proposition 47 (*Sledge*, at p. 1095), and the burden of proof on the prosecutor is higher under section 1170.95 (beyond a reasonable doubt) than the burden of proof under Proposition 47 (preponderance of the evidence), the standard of appellate review should be the same: "'Where the trial court applies disputed facts to . . . a statute, we review the factual findings for substantial evidence and the application of those facts to the statute de novo. [Citation.] '"[A]n order is presumed correct; all intendments are indulged in to support it on matters as to which the record is silent, and error must be affirmatively shown." [Citation.] In addition, we must '"view the record in the light most favorable to the trial court's ruling."'" (*Sledge*, at pp. 1095-1096; see *People v. Drayton* (2020) 47 Cal.App.5th 965, 981 [citing *Sledge* for the standard of review of an order denying a petition under

15

section 1170.95, but applying only the de novo standard of review to the superior court's interpretation of section 1170.95]; *People v. Salmorin* (2016) 1 Cal.App.5th 738, 743 [appellate court reviews factual findings by a superior court in a Proposition 47 proceeding for substantial evidence].)

  B. *The Superior Court Did Not Prejudicially Err in Referring to the Statement of Facts in* Witherspoon I

  Witherspoon argues the superior court improperly "premised" its denial of Witherspoon's petition on inadmissible hearsay contained in the statement of facts section of this court's opinion in Witherspoon's direct appeal. Witherspoon, however, forfeited this argument by not making it in the trial court and, in any event, it is based on a false premise; namely, that the trial court relied solely on the statement of facts in *Witherspoon I*. And any error was harmless.

  Section 1170.95, subdivision (d)(3), authorizes the prosecutor and the petitioner to rely on the record of conviction or to offer new evidence to meet their respective burdens. The "record of conviction" includes a court of appeal opinion and the trial record. (*People v. Tarkington, supra*, 49 Cal.App.5th at p. 899 & fn. 5; *Verdugo, supra*, 44 Cal.App.5th at p. 333.) The prosecutor here gave the court a copy of this court's opinion in *Witherspoon I*. Witherspoon, in his response to the prosecutor's informal opposition, did not object to the statement of facts in *Witherspoon I* or offer any new or additional evidence outside the record of conviction.

  At an October 29, 2019 hearing to calendar an evidentiary hearing on Witherspoon's petition, the superior court stated that the petition was "fully briefed," but the court told the parties that "if you do want to file anything else, you can." Again,

16

Witherspoon did not submit any additional pleadings or evidence. At the evidentiary hearing the superior court stated it had "read and considered the pleadings . . . including the exhibits attached thereto," which included the full 1991 trial record. Throughout the hearing, the parties and the court referred to the facts of the case as presented in the *Witherspoon I* opinion, and Witherspoon never objected. For example, the court stated, "The Court of Appeal opinion . . . set[s] forth [a] scenario . . . on pages 17 and 18" that "seems to be the only logical scenario the jury could have [found] in order to determine the guilty verdict." In response to the court's comment, counsel for Witherspoon referred to the 1991 trial transcript and gave the court a relevant excerpt, but counsel never objected to the facts presented in the *Witherspoon I* opinion. Toward the end of the hearing the court told counsel for Witherspoon it did not believe there was sufficient evidence to grant the petition, based "particularly on the Court of Appeal opinion," but the court invited counsel for Witherspoon to submit "anything else that you want me to consider prior to the ruling." Again, Witherspoon did not object to the superior court's reference to the facts discussed in this court's prior opinion or submit any new evidence to refute them.

Even if the statement of facts in the *Witherspoon I* opinion contains hearsay, an issue we need not address, "'the failure to object to . . . hearsay at trial forfeits an appellate claim that such evidence was improperly admitted.'" (*People v. Perez* (2020) 9 Cal.5th 1, 7; accord, *People v. Stevens* (2015) 62 Cal.4th 325, 333; see Evid. Code, § 353, subd. (a).) "'"The reason for the [objection] requirement is manifest: a specifically grounded objection to a defined body of evidence serves to prevent error. It allows the trial judge to consider excluding the evidence or

17

limiting its admission to avoid possible prejudice. It also allows the proponent of the evidence to lay additional foundation, modify the offer of proof, or take other steps designed to minimize the prospect of reversal.”’” (*Perez*, at p. 7; see *People v. Partida* (2005) 37 Cal.4th 428, 434.) By failing to object in the superior court to the statement of facts in the *Witherspoon I* opinion, Witherspoon deprived the court of the ability to prevent error by relying on the trial record instead of the statement of facts in *Witherspoon I*.

Finally, even if Witherspoon did not forfeit his hearsay argument, he has not demonstrated it is reasonably probable the superior court would have reached a more favorable result in the absence of any error. (See *People v. Covarrubias* (2016) 1 Cal.5th 838, 886-887 [erroneous admission of hearsay evidence under state law is reviewed for prejudice under the standard articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*)]; *People v. Yor Xiong* (2020) 54 Cal.App.5th 1046, 1071 [same].) In particular, Witherspoon has not identified any portion of the *Witherspoon I* statement of facts that misstated the evidence at trial, nor has he demonstrated that the superior court relied solely on the statement of facts in *Witherspoon I* to the exclusion of the trial transcript. The superior court stated in its ruling that it took the background facts of the case “predominantly,” but not solely, from our prior decision, and the superior court cited the clerk’s transcript from the trial as well as the *Witherspoon I* opinion.

C. *The Superior Court Did Not Prejudicially Err by Applying the Wrong Burden of Proof*

Section 1170.95, subdivision (d)(3), provides that “the burden of proof shall be on the prosecution to prove, beyond a reasonable doubt, that the petitioner is ineligible for

18

resentencing." Witherspoon speculates the superior court failed to hold the prosecutor to this standard because the court stated in its ruling that Witherspoon "could still be convicted" of first degree murder under section 189, subdivision (e). Section 1170.95, subdivision (a)(3), however, provides that a condition of vacating a conviction and resentencing the petitioner on any remaining counts is that the petitioner "could not be convicted of first or second degree murder because of changes to Section 188 or 189 made effective January 1, 2019." Thus, the language in the superior court's ruling Witherspoon points to is language in the statute; it does not indicate the superior court failed to apply the beyond-a-reasonable-doubt standard.

Witherspoon also complains about the superior court's statements that "it does not appear that the changes made to sections 188 and 189 would prevent [Witherspoon] from being convicted of murder" and that applicable law "suggests [Witherspoon] was a major participant in the underlying crime." While these statements could indicate a lower standard than "beyond a reasonable doubt," the superior court unequivocally stated in its conclusion that Witherspoon could still be convicted of first degree murder because he was a major participant in the underlying crime and acted with reckless indifference to human life. If, as Witherspoon suggests, the superior court "merely perform[ed] a quasi-appellate review" that considered the sufficiency of the evidence, the court would not have ordered an evidentiary hearing or considered at length whether Witherspoon was a major participant who acted with reckless indifference to human life under *Banks* and *Clark*. Instead, the superior court could have ruled, based on this court's decision in *Witherspoon I,* that Witherspoon was the actual shooter and therefore was ineligible for relief under section 1170.95. Moreover, in the absence of evidence to the contrary, "we presume that the

19

court 'knows and applies the correct statutory and case law.'" (*People v. Thomas* (2011) 52 Cal.4th 336, 361; see *Wade v. Superior Court* (2019) 33 Cal.App.5th 694, 716, fn. 9.)  The court's occasional use of imprecise language does not undermine the gravamen of the court's ruling that Witherspoon is ineligible for relief under section 1170.95.

Finally, to the extent the superior court may have held the prosecutor to a lower burden of proof than beyond a reasonable doubt, any error was harmless under *Watson*.  The retroactive relief provided by section 1170.95 is a legislative "act of lenity" intended to give inmates serving otherwise final sentences the benefit of ameliorative changes to applicable criminal laws. (*People v. Lopez* (2019) 38 Cal.App.5th 1087, 1115, review granted Nov. 13, 2019, S258175; see *People v. Howard* (2020) 50 Cal.App.5th 727, 740; *People v. Anthony* (2019) 32 Cal.App.5th 1102, 1156-1157.)  Thus, petitioners under section 1170.95 do not have a Sixth Amendment right to have a jury make new factual determinations about their liability beyond a reasonable doubt. (*Anthony*, at p. 1156; see *Lopez*, at pp. 1114-1115 [retroactive relief afforded by Senate Bill No. 1437 is not subject to Sixth Amendment analysis]; cf. *People v. Perez* (2018) 4 Cal.5th 1055, 1064-1065 [Proposition 36 does not implicate the Sixth Amendment right to have a jury find essential facts beyond a reasonable doubt]; *People v. Superior Court* (*Kaulick*) (2013) 215 Cal.App.4th 1279, 1304 [the retrospective part of Proposition 36 is not constitutionally required].)

Thus, even if the superior court erred by applying a lower standard of proof than beyond a reasonable doubt, such as a preponderance of the evidence, the court violated only state statutory law, not federal constitutional law.  (Cf. *People v. Frierson* (2017) 4 Cal.5th 225, 235-239 [the beyond-a-reasonable-doubt standard of proof under Proposition 36 is based on an

interpretation of state law and the structure and language of the statute].)  Therefore, such an error is harmless unless the petitioner can show it is reasonably probable he or she would have obtained a more favorable result absent the error. (Cf. *People v. Johnson* (2016) 1 Cal.App.5th 953, 968. [*Watson* harmless error standard applied to the trial court's error on a defendant's resentencing petition under Proposition 47].)  As explained in the next section, even if the superior court applied the wrong standard, it is not reasonably probable the court would have found Witherspoon eligible for relief under section 1170.95 had the superior court applied the correct standard because overwhelming evidence showed Witherspoon was, at a minimum, a major participant in the robbery murder who acted with reckless indifference to human life.

> D.   *Substantial Evidence Supported the Superior Court's Finding That Witherspoon Acted with Reckless Indifference to Human Life*

As discussed, the superior court concluded Witherspoon was a major participant in the robbery who acted with reckless indifference to human life.  Witherspoon does not challenge the court's finding that he was a major participant, but contends substantial evidence did not support the court's finding he acted with reckless indifference to human life.[6]

---

[6]   Witherspoon also argues the superior court erred in finding Witherspoon had the intent to kill Rucker, but the superior court did not make such a finding.

21

1. *Applicable Law*

As stated, section 189, subdivision (e), provides that a participant in a robbery where a death occurs may be liable for murder if the person was "a major participant in the [robbery] and acted with reckless indifference to human life, as described in subdivision (d) of Section 190.2." This provision requires courts to "examine the defendant's *personal* role in the crimes leading to the victim's death and weigh the defendant's individual responsibility for the loss of life, not just his or her vicarious responsibility for the underlying crime." (*Banks, supra,* 61 Cal.4th at p. 801.)

The Supreme Court in *Banks* and *Clark* identified several nonexclusive factors to guide courts in determining when a defendant's culpability is sufficient to make him or her death eligible under section 190.2, subdivision (d), even when the defendant was not the actual killer. (See *Clark, supra,* 63 Cal.4th at pp. 618-622; *Banks, supra,* 61 Cal.4th at p. 803.) Because these factors construe the language from section 190.2, subdivision (d), which the Legislature incorporated into section 189, subdivision (e), they apply when determining whether a person convicted of felony murder is eligible for relief under section 1170.95. (*People v. Smith* (2020) 49 Cal.App.5th 85, 93-94, review granted July 22, 2020, S262835; *People v. Torres* (2020) 46 Cal.App.5th 1168, 1179, review granted June 24, 2020, S262011.)

In *Banks* the Supreme Court identified factors relevant to determining whether a defendant was a major participant in the underlying felony,[7] but also described the requisite state of mind

---

[7] Those factors are: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths?

of showing a reckless indifference to human life: "Awareness of no more than the foreseeable risk of death inherent in any armed crime is insufficient; only knowingly creating a 'grave risk of death' satisfies the constitutional minimum." (*Banks*, *supra*, 61 Cal.4th at p. 808.) The Supreme Court distinguished between "a participant in an armed robbery [who] could anticipate lethal force might be used" and one who "knew his own actions would involve a grave risk of death." (*Id.* at pp. 807-808.)

In *Clark* the Supreme Court further described the mental state and kind of conduct necessary to show a reckless indifference to human life for purposes of section 190.2, subdivision (d). In general, a reckless indifference to human life "encompasses a willingness to kill (or to assist another in killing) to achieve a distinct aim, even if the defendant does not specifically desire that death as the outcome of his actions." (*Clark*, *supra*, 63 Cal.4th at p. 617.) The necessary state of mind is "'implicit in knowingly engaging in criminal activities known to carry a grave risk of death.'" (*Id.* at p. 616; see *In re Scoggins* (2020) 9 Cal.5th 667, 676 (*Scoggins*).) Thus, the inquiry has a subjective and an objective element. (*Scoggins*, at p. 677.) "As to the subjective element, '[t]he defendant must be aware of and willingly involved in the violent manner in which the particular

_____

What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used?" (*Banks*, *supra*, 61 Cal.4th at p. 803, fn. omitted.)

offense is committed,' and he or she must consciously disregard 'the significant risk of death his or her actions create.' [Citations.]  As to the objective element, "'[t]he risk [of death] must be of such a nature and degree that, considering the nature and purpose of the actor's conduct and the circumstances known to him [or her], its disregard involves a gross deviation from the standard of conduct that a law-abiding person would observe in the actor's situation.'" [Citation.]  'Awareness of no more than the foreseeable risk of death inherent in any [violent felony] is insufficient' to establish reckless indifference to human life; 'only knowingly creating a "grave risk of death"' satisfies the statutory requirement.  [Citation.]  Notably, 'the fact a participant [or planner of] an armed robbery could anticipate lethal force might be used' is not sufficient to establish reckless indifference to human life." (*Scoggins*, at p. 677.)

The case-specific factors the Supreme Court identified in *Clark* to determine whether a defendant's state of mind and conduct meet the standard for reckless indifference to human life include:  (1) the defendant's knowledge of weapons, the number of weapons used, and the defendant's use of weapons; (2) the defendant's physical presence at the crime and opportunities to restrain the crime and/or aid the victim; (3) the duration of the interaction between the perpetrators of the felony and the victims; (4) the defendant's knowledge that his cohort was likely to kill; and (5) whether the defendant made efforts to minimize the risk of violence during the felony.  (*Clark*, *supra*, 63 Cal.4th at pp. 618-622; see *Scoggins*, *supra*, 9 Cal.5th at p. 677.)  "'[N]o one of these considerations is necessary, nor is any one of them necessarily sufficient.'" (*Clark*, at p. 618.)  We analyze the totality of the circumstances to determine whether Witherspoon

acted with reckless indifference to human life. (See *Scoggins*, at p. 677.)

The *Clark* factors for determining reckless indifference to human life significantly overlap with the *Banks* factors for determining whether a defendant was the major participant in an underlying felony. (*People v. Murillo* (2020) 54 Cal.App.5th 160, 171 ["Because the issue of reckless indifference to human life overlaps significantly with major participation in the underlying felony, the relevant factors are similar to those stated in *Banks*."], petn. for review pending, petn. filed Oct. 13, 2020, S264978.) Indeed, "'the greater the defendant's participation in the felony murder, the more likely that he acted with reckless indifference to human life.'" (*Clark*, *supra*, 63 Cal.4th at p. 615.)

### 2. *The* Clark *Factors Show Witherspoon Acted with Reckless Indifference to Human Life*

The superior court applied the *Clark* factors, compared the facts of this case to those in *Banks* and *Clark*, and concluded Witherspoon acted with reckless indifference to human life. Substantial evidence supports that finding.

First, Witherspoon knew there were guns at the scene of the shooting because, as evidenced by his statements to Durham, he had two guns in his car: a semi-automatic rifle and a gun small enough to fit under the seat of his car. This factor weighs in favor of finding Witherspoon acted with a reckless indifference to human life. (See *Clark*, *supra*, 63 Cal.4th at p. 618 [that accomplices bring weapons to the scene of the crime weighs in favor of finding they acted with reckless indifference to life].)

25

Second, there was substantial evidence Witherspoon was present at the scene of Rucker's murder, which Witherspoon all but concedes in his brief on appeal by stating he "was likely at the shooting scene." The evidence, and reasonable inferences from that evidence, showed that Rucker had plans to meet with Witherspoon around the same time as the shooting to consummate their drug deal, that Durham saw Witherspoon in his Nissan shortly before the shooting, that Witherspoon's car sustained damage from a bullet, that the location of the shooting was near a house where Witherspoon once lived, and that Witherspoon told Rucker's father the location of the shooting before police arrested and questioned Witherspoon. (See *People v. Brooks* (2017) 3 Cal.5th 1, 57 ["'Substantial evidence includes circumstantial evidence and any reasonable inferences drawn from that evidence.'"].)

Taken together, this evidence shows Witherspoon was at the scene of the murder. Moreover, Witherspoon was physically present "during the entire sequence of events culminating in the murder[ ]" (*Clark*, *supra*, 63 Cal.4th at p. 619), from his first introduction to Rucker when he told Rucker he had 15 kilograms of cocaine, to the collection of money for the cocaine Witherspoon supposedly had, to Rucker's death. (See *ibid.* ["[p]roximity to the murder and the events leading up to it may be particularly significant"].)

Also relevant to the second factor is whether the defendant acted "as a restraining influence on murderous cohorts." (*Clark*, *supra*, 63 Cal.4th at p. 619.) "'If the defendant fails to act as a restraining influence, then the defendant is arguably more at fault for the resulting murders.'" (*Ibid.*) To the extent someone else shot Rucker, as Witherspoon speculates (without offering

any evidence that anyone else was present), Witherspoon made no effort to help Rucker by calling the 911 emergency operator or providing first aid or comfort.  (See *ibid.* [defendants showed a reckless indifference to human life by failing to make "'an effort to help the victims'"].)  Witherspoon argues that, because the bullets killed Rucker, Witherspoon could not have given him any aid.  But the testimony at trial showed (and the argument by counsel for Witherspoon conceded) Rucker was still alive when the paramedics arrived.  That the petitioner was physically present at the scene and did not make an attempt to prevent the shootings or assist the victim is "particularly significant" to the reckless indifference inquiry.  (*In re Loza* (2017) 10 Cal.App.5th 38, 53-54; see *People v. Murillo, supra*, 54 Cal.App.5th at p. 172 ["In *Banks* and *Clark*, and in other cases in which a court has overturned a special circumstance finding, the defendant either was not present at the scene of the killing, or at least was not capable of preventing his cohort from acting."].)

Third, "[t]he duration of the interaction between victims and perpetrators is . . . one consideration in assessing whether a defendant was recklessly indifferent to human life."  (*Clark, supra*, 63 Cal.4th at p. 620.)  For example, "[w]here a victim is held at gunpoint, kidnapped, or otherwise restrained in the presence of perpetrators for prolonged periods, 'there is a greater window of opportunity for violence' [citation] possibly culminating in murder."  (*Ibid.*)  This factor is neutral because the duration of time that Witherspoon spent with Rucker was not significant, although the evidence showed Witherspoon spent some time with Rucker before the shooting.

The fourth factor, the defendant's knowledge that his cohort was likely to kill, is also neutral because there is no

evidence anyone other than Witherspoon was present at Rucker's shooting. There was, however, substantial evidence to support the jury's verdict of deliberate, premeditated murder, which suggests Witherspoon was not only likely to kill, but had the intent to kill. (See *Witherspoon I*, *supra*, B061260 [finding substantial evidence to support a jury verdict of deliberate, premeditated murder].)

Finally, whether the defendant made efforts to minimize the risk of violence during the felony is relevant, as is whether the defendant planned the crime to "elevate[ ] the risk to human life beyond those risks inherent in any armed robbery." (*Clark*, *supra*, 63 Cal.4th at p. 623.) There is no evidence Witherspoon did anything to minimize the risk of violence in his interaction with Rucker. Indeed, he brought two guns with him to a meeting at which Witherspoon apparently planned to tell Rucker he was not delivering any drugs to him but was going to keep Rucker's money.

Witherspoon argues that there is no evidence he planned to "harm or kill anyone" and that "the taking [of Rucker's money] was done non-violently." But as the superior court found, Rucker's shooting "was the culmination of a week-long scam." While Rucker initially may have parted with his money "non-violently," he did so only because he thought he was getting 15 kilograms of cocaine in return. Witherspoon could have taken the money and left town or otherwise disappeared without having killed (or arranged to kill) Rucker. Instead, Witherspoon met with Rucker once more under the pretense of delivering the cocaine, drove him to a dark street in a neighborhood where Witherspoon used to live and that was close to a freeway, and shot (or, less likely, had someone else shoot) Rucker. The use of a

28

gun was not merely to create fear as in a "'garden-variety armed robbery'" (*Clark, supra*, 63 Cal.4th at p. 617, fn. 74); Witherspoon already had the money.  Witherspoon used the gun to make sure he could keep the money.  Contrary to Witherspoon's speculation that shooting Rucker must have been a "spontaneous reaction" (by someone), the evidence showed the only reason Witherspoon met Rucker that night was to kill him.

Thus, the totality of the circumstances surrounding the robbery murder, "the magnitude of the objective risk of lethal violence," and Witherspoon's "subjective awareness of that risk" showed that Witherspoon acted with a reckless indifference to human life.  (*Clark, supra*, 63 Cal.4th at p. 623.)  Witherspoon appeared willing to kill (or to assist another in killing) Rucker to achieve a distinct aim: to keep hundreds of thousands of dollars Witherspoon took from Rucker in a sham drug deal.  (See *id.* at p. 617.)

## DISPOSITION

The order is affirmed.

SEGAL, J.

We concur:

PERLUSS, P. J.                    FEUER, J.

29